PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

KENZI NORIS ELIZABETH SNIDER,

*Plaintiff-Appellee,*

v.

SEUNG LEE, Federal Bureau of Investigation Agent,

*Defendant-Appellant,*

and

MARC DIVITTIS, Federal Bureau of Investigation Agent; MARK MANSFIELD, United States Army Criminal Investigation Division Agent; UNITED STATES OF AMERICA,

*Defendants.*

No. 08-1414

Appeal from the United States District Court
for the Southern District of West Virginia, at Huntington.
Robert C. Chambers, District Judge.
(3:07-cv-00335)

Argued: May 12, 2009

Decided: October 6, 2009

Before NIEMEYER and MICHAEL, Circuit Judges,
and Frederick P. STAMP, Jr., Senior United States District
Judge for the Northern District of West Virginia,
sitting by designation.

Reversed and remanded by published opinion. Judge Niemeyer wrote the opinion, in which Judge Michael joined. Senior Judge Stamp wrote a separate opinion concurring in the judgment.

---

## COUNSEL

**ARGUED**: Catherine Yvonne Hancock, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. J. Samuel Tenenbaum, NORTHWESTERN UNIVERSITY SCHOOL OF LAW, Chicago, Illinois, for Appellee. **ON BRIEF:** Gregory G. Katsas, Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles T. Miller, United States Attorney, Charleston, West Virginia, Barbara L. Herwig, Joshua Waldman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Fletcher B. Brown, Christopher C. Colon, Jamie L. Owen, Senior Law Students, NORTHWESTERN UNIVERSITY SCHOOL OF LAW, Chicago, Illinois; Deirdre H. Purdy, Chloe, West Virginia, for Appellee.

---

## OPINION

NIEMEYER, Circuit Judge:

The district court denied FBI Agent Seung Lee qualified immunity in connection with his investigation and interrogation of Kenzi Snider for the murder of a fellow exchange student, Jamie Penich, in Seoul, South Korea. During Lee's interrogations, Snider repeatedly confessed to the murder. When South Korea requested extradition, a hearing was conducted in the United States before a magistrate judge, who rejected Snider's claim that her confessions were coerced and concluded that probable cause existed for her extradition. The

Secretary of State then extradited Snider to South Korea for trial.

After Snider was acquitted by South Korean courts, she commenced this *Bivens*[1] action against Lee and others for an array of constitutional violations, all of which the district court dismissed except for Snider's Fourth Amendment claim for malicious prosecution based on her allegation of "wrongful extradition."

Because Snider did not identify, in the circumstances of this case, a well-established constitutional violation, we conclude that Agent Lee is entitled to qualified immunity and reverse.

I

On March 17, 2001, Kenzi Snider and Jamie Penich, American exchange students in South Korea, returned together to their hotel rooms in the Itaewon region of Seoul, South Korea, after socializing in a local bar with fellow students and U.S. Army personnel. Because Penich was intoxicated and unable to walk on her own, Snider assisted Penich back to her hotel room.

The next morning, Penich was found naked and dead in her room. The evidence showed that she had been stomped to death, and the South Korean coroner concluded that she had died from suffocation. South Korean police questioned the group of students, including Snider, but did not make any arrests. The evidence at the time suggested that Penich was murdered by one or two men, but that evidence was inconclusive, and the investigation languished. Snider returned to the United States and enrolled in Marshall University in Huntington, West Virginia.

---

[1]*Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

In the face of demands from Penich's family and political pressure, agents of the FBI stationed in Korea, including Agent Seung Lee, joined the investigation. In reviewing the statements taken at the time of the murder, the agents became concerned about discrepancies between Snider's statements and the physical layout of the hotel room where Penich had been found, as well as the statements given by other students in the group. Based on their suspicions that Snider was not being completely truthful about her actions that night, Agents Mark Mansfield and Lee, as well as FBI polygrapher Mark DiVittis, traveled to Huntington, West Virginia, in February 2002 to speak with Snider.

The agents contacted Snider and invited her to come to the hotel where they were staying to answer some questions. Snider agreed to meet with the agents, and she set the time for the meeting, to take place on February 4, 2002. When Snider arrived at the hotel with a friend, the agents requested that the friend remain downstairs while the agents spoke with Snider in Agent Lee's hotel room, and Snider agreed.

At this first interrogation session—which all parties described as very friendly—the agents made clear that they were investigating Penich's murder and stated that extradition of Penich's killer to South Korea would be difficult. They also cited cases where murders of Korean citizens by foreign nationals resulted in light sentences. Snider felt sufficiently comfortable to share with the agents that she had not been sleeping well since the murder and that she had been having strange dreams, including one about being attacked by a train and a shark at the same time. Agent DiVittis suggested to Snider that dreams about trains indicate sexual conflict. After three hours, the session ended, and Snider agreed to return the next day at a time of her choosing and to bring with her a written summary of what she remembered from the night of Penich's murder.

The next day, February 5, 2002, Snider arrived again at Agent Lee's room and brought homemade ice cream to share

with the agents. In response to the agents' inquiry about her relationship with Penich, Snider stated that the two were close friends and that Penich had even confided in Snider that she was anorexic. Snider then gave the agents the handwritten statement that she had prepared the night before. This statement was generally consistent with her earlier statement given at the time of the murder but contradicted some details. When asked about the discrepancies, Snider explained that her present statement was different from her previous statement because she "didn't remember [the additional details] at the time."

Agent DiVittis then confronted Snider, telling her that the investigation showed that she murdered Penich. In making this accusation, however, DiVittis allowed how Snider probably "didn't mean to" and that perpetrators often "hide a memory and cover it up with another one" so that they can "handle it." Snider became upset by the accusation and left the room. A moment later, however, she returned.

After she returned to the room, Snider asked the agents if she needed an attorney. The agents told her that a lawyer would just complicate things and that if she had an attorney, they would not be able to say that she had fully cooperated. Snider did not bring up the subject of an attorney again. The agents then suggested that Snider was repressing her true memories of the night. But before asking additional questions, they asked her, "Do you want to do this?" Snider indicated that she was willing to answer additional questions. When Agent DiVittis asked Snider about her emotions towards Penich, Snider stated that although she did not feel lustful toward other women, she had become excited when Penich undressed in front of her on the night of the murder. Agent DiVittis then asked Snider to recount step-by-step her actions on the night of the murder.

Snider, now sitting in a chair hunched over with her eyes closed, began to confess in detailed fashion how she murdered

Penich. She recounted a sexual encounter with Penich that resulted in Snider becoming angry, striking Penich, and then killing her by stomping on her head. Agents prompted Snider whenever she would pause by asking "What did you do then?" or "How did you move the body?" or "What set you off in a panic?" Several of the details provided by Snider corresponded to what the agents knew about the evidence at the crime scene. They noted that the bruising on Penich's face was consistent with Snider's confession that she slapped Penich; that the bruising on Penich's back was consistent with Snider's confession that she dropped Penich on the bathtub; and that the way Penich's clothes were arranged on the floor corresponded with Snider's story that Penich had undressed seductively in front of her, removing both jeans and underwear at the same time. This statement contradicted Snider's earlier statement that she had left Penich alone in the hotel room dressed only in her underclothes. Snider also now stated that she returned to her hotel room only once that night, contrary to her earlier statement but consistent with the testimony of her roommate. Snider concluded her statement to the agents by saying that she locked the door to her hotel room that night in order to lock out the bad thoughts of the murder.

The three agents then left the room for a moment. When they returned, Snider, without prompting, gave them additional details of the murder. When the agents asked if she would come back the next day to make a formal statement, she agreed and again set the time for the meeting. The agents then followed Snider home to retrieve the clothing that she was wearing on the night of the murder and departed.

The next day, February 6, 2002, Snider returned to the hotel room as agreed and again recounted the sexual encounter and subsequent murder, adding additional details that she "remembered" the night before. The agents wrote a summary of her confession, which Snider then read and signed. The statement specifically noted that Snider had not been promised anything or threatened by the agents. Before she left, the

agents fingerprinted and photographed her and told her not to leave the State without permission. Snider thereafter withdrew from school.

Several weeks later, on the petition of South Korea and at the request of the State Department, Snider was arrested and taken into custody. At the time, she signed a *Miranda* waiver and repeated the same confession to her arresting officers that she had given at the hotel room to the agents questioning her then.

At the extradition hearing, Snider testified for the first time that Agents Mansfield, Lee, and DiVittis had coerced her. She stated that she did not believe that her confession was based on true memories and that she was "not confident" that her statements about the night of the murder were accurate. Snider asserted that, because the agents challenged her version of the events that night, as well as her memory of them, she had simply tried to find the right memories. When asked why she never retracted the confession, even after being arrested, Snider stated that she did not know that retraction was an option. Finally, when asked if she murdered Penich, Snider stated, "Not by the memories I hold true." She never asserted unequivocally that she did not murder Penich.

At the extradition hearing, Snider also produced an expert on coerced confessions, who testified that introducing any discussion of punishment into the interrogation increases the chance of a false confession. He also stated that this tactic of interrogation "may create false confessions." The expert admitted that his opinion and studies were based on observations and that there were no controlled experiments to verify his hypothesis. When asked specifically about Snider's confession, the expert stated that his examinations of the record "suggest strongly that it could be a false confession." The expert also stated that the confession was "more likely to be the product of influence than the product of the actual experiences of having been there."

At the conclusion of the evidence, the magistrate judge conducting the extradition hearing concluded that "the evidence presented does not establish that Ms. Snider's will was 'overborne' or that her 'capacity for self-determination [was] critically impaired' by the manner in which she was interrogated." (Citation omitted). Based on Snider's confessions, their internal corroboration, and their corroboration by the other evidence, the judge concluded that there was probable cause to believe that Snider murdered Penich. The judge certified his findings and the evidence to the Secretary of State, who, pursuant to an extradition treaty between South Korea and the United States, elected to extradite Snider to South Korea. Snider did not challenge the extradition order.

Following trial in South Korea, Snider was acquitted by the Seoul District Court on June 19, 2003, and the acquittal was upheld by appellate courts, including, on January 13, 2006, the South Korean Supreme Court.

Snider commenced this *Bivens* action on May 24, 2007, alleging a variety of constitutional and state law claims. The district court dismissed all of her claims except for a claim for malicious prosecution because they were barred under the applicable statute of limitations. The court concluded that because the last element of her malicious prosecution claim—that Snider succeed in the criminal proceeding—occurred within two years of the filing of the complaint, the malicious prosecution claim was not time-barred. The district court also concluded that Agent Lee was not protected by qualified immunity. From the order denying qualified immunity on the malicious prosecution claim, Agent Lee filed this appeal.

II

The doctrine of qualified immunity protects government officials from civil damage actions to the extent that the officials do not violate clearly established constitutional rights. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Officials

have qualified immunity either if the facts do not make out a violation of a constitutional right or if the right was not clearly established at the time. In this case, we need address only the first question, whether the plaintiff made out a violation of a constitutional right based on the facts submitted. *See Pearson v. Callahan*, 129 S. Ct. 808, 815-16, 818-19 (2009).

In her complaint, Snider alleged that during the interrogations, Agent Lee manipulated her into giving a false confession by using misleading statements about the "psychological repression" of memory, by denying her the right to a lawyer, and by understating the consequences of a confession under South Korean law. She claimed that this conduct violated her rights under the Fourth and Fifth Amendments to be free from unreasonable seizures (including false arrest and false imprisonment), coercion leading to her confessions, the failure of government officials to intervene in the face of wrongful conduct, denial of counsel, and malicious prosecution (alleged as "wrongful extradition").[2]

On Agent Lee's motion, the district court dismissed all of Snider's claims against Lee except her claim for malicious prosecution. And with respect to the claim for malicious prosecution, the district court denied Agent Lee's claim of qualified immunity, without addressing the specific reasons for doing so, although the court did refer to the fact that Snider's rights to counsel, to "intervention," and to be free from coercion "were clearly established."

Snider devotes most of her brief to arguing that these facts, particularly the alleged coercion, justify her claim of wrongful seizure under the Fourth Amendment because her seizure was

---

[2]Snider captioned Count II of her complaint as "Deprivation of Right to Fair Trial, Wrongful Extradition and Wrongful Imprisonment" under the "5th Amendment." The district court concluded that this count should best be taken as a claim for malicious prosecution under the Fourth Amendment, and Snider accepts that view.

not supported by probable cause. She reasons that Agent Lee improperly coerced a confession to create the probable cause and that, absent the confessions, there was no other evidence to support her arrest. But Snider cannot rely solely on the unreasonableness of her seizure even though her substantive allegations with respect to her seizure might amount to a violation of the Fourth Amendment. The district court already concluded that Snider's time for bringing her claims based on a wrongful seizure alone has long passed. Snider was arrested for extradition on February 28, 2002, and therefore should have brought any allegations of improper arrest or wrongful seizure within two years of that date. Yet she did not file her complaint in this action until May 24, 2007, over five years after her arrest.

To avoid the limitations issue, Snider alleges malicious prosecution, of which wrongful seizure is only an element. To satisfy the other element, she relies on her acquittal in the trial in South Korea.

While it is not entirely clear whether the Constitution recognizes a separate constitutional right to be free from malicious prosecution, *see Albright v. Oliver*, 510 U.S. 266, 279-80 n.5 (1994) (Ginsburg, J., concurring); *Lambert v. Williams*, 223 F.3d 257, 261-62 (4th Cir. 2000), if there is such a right, the plaintiff must demonstrate both an unreasonable seizure and a favorable termination of the criminal proceeding flowing from the seizure. In *Lambert* we explained:

> Our analysis in *Brooks* [*v. City of Winston-Salem*, 85 F.3d 178 (4th Cir. 1996)], understood in light of these precedents, makes clear that there is no such thing as a "§ 1983 malicious prosecution" claim. What we termed a "malicious prosecution" claim in *Brooks* is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution

—specifically, the requirement that the prior proceeding terminate favorably to the plaintiff.

223 F.3d at 262. In a footnote, we explained the significance of the second element of a malicious prosecution claim:

As we noted in *Brooks*, the significance of the favorable termination element is not only that *it constitutes a prerequisite for recovery*, but also that it establishes the time from which the claim accrues for purposes of determining whether the statute of limitations has run.

*Id.* at 262 n.3 (emphasis added).

In short, even though Snider is time-barred from pursuing a claim for wrongful seizure under the Fourth Amendment, she is free to pursue a claim under the Fourth Amendment that has two elements—a wrongful seizure and a termination in her favor of the proceedings following her seizure. For the first element, Snider alleges that Agent Lee's conduct—obtaining coerced confessions from her—improperly established probable cause for her arrest for the purpose of extradition to South Korea. And for the second element, she alleges that the criminal proceedings in South Korea terminated in her favor.

While Snider appropriately recognizes that "the criminal proceeding [following her seizure] must have terminated in [her] favor," she assumes without further discussion that the Korean acquittal satisfies this second element. Such an assumption, however, presumes that any protection under the Fourth Amendment against malicious prosecution extends to a prosecution in a foreign nation. Yet, Snider's constitutional rights are not so far-reaching.

Snider's seizure in the United States was effected by United States law enforcement officers, acting on a warrant

issued pursuant to a complaint for extradition initiated at the request of Korea. She was not arrested to be tried for murder in the United States; rather, she was arrested to be subjected to an extradition hearing, the only U.S. judicial proceeding that occurred. Following that hearing, the U.S. judicial officer certified probable cause to the Secretary of State, who, acting under treaty and under statutorily conferred discretion, transferred Snider from the United States to South Korea for trial.

Extradition of a U.S. citizen to a foreign nation is an act of the Executive Department pursuant to a treaty between the United States and that foreign nation, *see* 18 U.S.C. § 3181(a), and a citizen of the United States may be extradited only upon the discretion of the Secretary of State, *id.* § 3186. "In deciding whether to extradite, the Secretary may consider factors affecting both the individual defendant as well as foreign relations—factors that may be beyond the scope of the . . . judge's review." *Mironescu v. Costner*, 480 F.3d 664, 666 (4th Cir. 2007) (internal quotation marks and citation omitted).

To be sure, before the Secretary of State considers extradition, the citizen is tried before a U.S. judicial officer on a complaint filed under oath, but the trial is conducted only to determine whether "the evidence of criminality" is "sufficient to sustain the charge under the provisions of the proper treaty." 18 U.S.C. § 3184. If the judicial officer finds sufficient cause, the officer certifies that fact to the Secretary of State and transmits to the Secretary all of the evidence in the proceedings, *id.*, and with that the U.S. judicial proceeding ends.

The process before the judicial officer on the extradition complaint is the judicial process that the United States affords a citizen being extradited, and after extradition, the citizen is tried under the laws of the foreign nation. The arrest of the citizen in the United States is made on a warrant issued after the complaint of extradition is filed to compel the citizen to

attend the extradition hearing. *See* 18 U.S.C. § 3184 (authorizing "warrant for the apprehension of the person so charged [in the extradition complaint], that he may be brought before such [judicial officer], to the end that the evidence of criminality may be heard and considered [in the extradition proceeding]"); *see generally Mironescu*, 480 F.3d at 665-66. And the judicial officer's certificate following the hearing is the final judgment in the United States proceedings. In general, it is subject only to collateral attack through a habeas corpus proceeding. *See Mironescu*, 480 F.3d at 669; *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993).

Thus, in this case, Snider was arrested only to compel her to appear at the hearing to determine the sufficiency of evidence for extradition. Upon completion of that judicial proceeding—which was subject to the protections of the Fourth and Fifth Amendments—the Executive Department, through the Secretary of State, made the discretionary decision to extradite Snider to South Korea. South Korea then followed its own process in trying her, and that process need not have provided her with the protections of the U.S. Constitution. As the Supreme Court stated:

> The currently received understanding of the Bill of Rights as instituted "*to curtail and restrict the general powers granted to the Executive, Legislative, and Judicial Branches*" of the National Government defined in the original constitutional articles* was expressed early on in Chief Justice Marshall's opinion for the Court in the leading case of *Barron ex rel. Tiernan v. Mayor of Baltimore*, 7 Pet. 243, 247 (1833): the Constitution's "limitations on power . . . are naturally, and, we think, necessarily applicable to the government created by the instrument," and not to "distinct [state] governments, framed by different persons and for different purposes."

*United States v. Balsys*, 524 U.S. 666, 674-75 (1998) (emphasis added) (citation omitted). In *Balsys*, the defendant declined

to answer a question about his activities during World War II for fear of prosecution by Lithuania or Israel. The Supreme Court held "that concern with foreign prosecution is beyond the scope of the Self-Incrimination Clause." *Id.* at 669. In reaching its holding, the Supreme Court stated that even though the defendant's fear of prosecution by a foreign nation might be reasonable, the criminal prosecution *by a foreign government* was nonetheless not subject to U.S. constitutional guarantees. *Id.* at 672-74.

Likewise, Snider may not rely on her acquittal by the South Korean courts to satisfy her burden of demonstrating termination of the proceedings in her favor in connection with a seizure in the United States. The seizure in the United States was for purposes of conducting the extradition hearing, not the murder trial, and the extradition hearing did *not* terminate in Snider's favor. The U.S. magistrate judge rejected Snider's contentions that her various confessions were coerced. That ruling was a final judgment, and Snider did not challenge it collaterally through a habeas corpus proceeding. It is the extradition proceeding to which we must look for determining whether Snider was successful for purposes of a malicious prosecution claim under the Fourth Amendment because her seizure was effected only for the purpose of conducting the extradition hearing. Moreover, even if the successful outcome in South Korea could be causally relevant—a proposition that is not clear inasmuch as the South Korean trial depended on the Secretary of State's discretionary decision to make Snider available for that trial—the Supreme Court has made clear that U.S. constitutional protections do not extend to foreign prosecutions. *See Balsys*, 524 U.S. at 700 ("mere support of one nation for the prosecutorial efforts of another does not transform the prosecution of the one into the prosecution of the other").

Because there was no favorable outcome in the U.S. proceedings, as necessary to support Snider's malicious prosecution claim under the U.S. Constitution, Snider fails on the

threshold inquiry of whether she alleged the violation of a constitutional right. While we recognize that Snider did allege constitutional violations in connection with her interrogation and arrest, these claims are not before us. Our holding is limited to Snider's claim that Agent Lee violated her well-established U.S. constitutional right *to be free from malicious prosecution in the United States*. Because she has not alleged a violation of such a right, Agent Lee is entitled to qualified immunity.

Accordingly, we reverse and remand for dismissal of Snider's claim against Agent Lee for malicious prosecution.

*REVERSED AND REMANDED*

STAMP, Senior District Judge, concurring in the judgment:

I concur in the result reached by the majority opinion holding that Agent Lee is entitled to qualified immunity and reversing and remanding for dismissal of Snider's claims of malicious prosecution against Agent Lee. Because I would come to this result through a somewhat different approach, I respectfully write separately.

To prevail on a Fourth Amendment malicious prosecution claim under § 1983, a plaintiff must show that: (1) the defendant initiated or maintained a criminal proceeding; (2) the criminal proceeding terminated in the plaintiff's favor; (3) the proceeding was not supported by probable cause; and (4) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *See Lambert v. Williams*, 223 F.3d 257, 260-262 (4th Cir. 2000) (observing that a "malicious prosecution" claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates the common law malicious prosecution tort elements except for malice). The element requiring favorable termination of the criminal proceedings constitutes both a predicate for recovery under

§ 1983 and the accrual date of the claim for determining the running of the statute of limitations. *See Brooks v. City of Winston-Salem*, 85 F.3d 178, 183-84 (4th Cir. 1996). This element is satisfied where a prior criminal case against the plaintiff has been disposed of in a way that indicates the plaintiff's innocence. *See Murphy v. Lynn*, 118 F.3d 938, 948 (2d Cir. 1997) ("Where the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused . . . only when its final disposition is such as to indicate the innocence of the accused."). A termination may be favorable to an accused where such termination is the result of:

> (a)   a discharge by a magistrate judge at a preliminary hearing, or
>
> (b)   the refusal of a grand jury to indict, or
>
> (c)   the formal abandonment of the proceedings by the public prosecutor, or
>
> (d)   the quashing of an indictment or information, or
>
> (e)   an acquittal, or
>
> (f)   a final order in favor of the accused by a trial or appellate court.

Restatement 2d of Torts § 659 (1976); *accord Kossler v. Crisanti*, 564 F.3d 181, 187 (3d Cir. 2009). Requiring a plaintiff to show a favorable termination works to ensure against inconsistent judgments and to avoid parallel litigation on issues of probable cause. *See Murphy*, 118 F.3d at 948.

   In this action, the majority opinion holds that Snider's claims against Agent Lee must be dismissed because Snider's acquittal by the South Korean court does not establish the favorable termination element of a Fourth Amendment mali-

cious prosecution cause of action. The majority reaches this result by finding that an accused's constitutional protections do not extend to foreign prosecutions. According to the majority, Snider may not rely upon her acquittal as establishing the favorable termination element of her malicious prosecution claim because the favorable termination of Snider's prosecution occurred in a foreign jurisdiction, In the majority's view, the only United States proceeding relevant to Snider's malicious prosecution claim is the extradition hearing, which terminated adversely to Snider. Accordingly, the majority concludes that Snider has failed to allege a constitutional violation and that Agent Lee is therefore entitled to qualified immunity.

According to the majority's opinion, only two elements comprise a Fourth Amendment malicious prosecution claim: (1) a wrongful seizure, and (2) termination in the defendant's favor of the proceedings following the seizure. As stated above, it seems well established in this Circuit, and others, that a malicious prosecution claim requires at least four elements: (1) the initiation or maintenance of a criminal proceeding; (2) favorable termination of that proceeding; (3) lack of probable cause to support that proceeding; and (4) a wrongful seizure flowing from that proceeding.[1] While the majority's formulation may possibly be read as implicitly incorporating these four elements, it would probably be useful to explicitly set forth the four elements.

Further, the majority opinion states that Snider was seized by United States law enforcement officials pursuant to an arrest warrant issued on the basis of the Korean government's extradition request. In the majority's view, the sole purpose of the arrest was to hold an extradition hearing. This seems to

[1]Some courts require a showing of malice as a fifth element. The Fourth Circuit has rejected malice as an element to a Fourth Amendment "malicious prosecution" claim. *See Brooks v. City of Winston-Salem*, 85 F.3d 178, 184 n.5 (4th Cir. 1996).

me an overly narrow characterization of the reasons underlying Snider's seizure. Certainly, Snider was arrested and ordered to appear before a magistrate judge for an extradition hearing, but the extradition hearing was merely a means of prosecuting the broader criminal action against Snider.[2] Thus, I believe the purpose of Snider's seizure was to determine whether the criminal prosecution should proceed by ascertaining whether Snider was extraditable. In other words, the purpose of the arrest was to advance the prosecution toward its termination (be it favorable or unfavorable). At the conclusion of the extradition hearing, the proceedings against Snider did not end. She was detained, extradited to Korea, tried, and ultimately acquitted. Therefore, it seems to me that the extradition hearing was simply one aspect of the broader purpose of Snider's arrest—that is, the prosecution of the murder charge against her.

Where a criminal prosecution terminates in favor of a defendant who, as a result of the criminal proceedings, has suffered a deprivation of liberty without probable cause, a Fourth Amendment "malicious prosecution" cause of action will lie. As noted above, a favorable termination can occur in one of many ways. For example, had the magistrate judge concluded that Snider was not extraditable for lack of probable cause, the proceedings would have terminated in her favor. However, acquittal is also a favorable termination. Snider was acquitted. That her acquittal was effected under the authority of the Korean government is not as significant as the fact that the criminal proceedings terminated in her favor.

Also, the majority's opinion does not seem to me to

---

[2]Extradition is sui generis, neither civil nor criminal in nature. *See, e.g.*, *Jhirad v. Ferrandina*, 536 F.2d 478, 482 (2d Cir. 1976), *cert. denied*, 429 U.S. 833 (1976); *Martin v. Warden*, 993 F.2d 824, 828 (11th Cir. 1993); *In re Nava Gonzalez*, 305 F. Supp. 2d 682, 689 (S.D. Tex. 2004); *In re Extradition of Massieu*, 897 F. Supp. 176, 177 (D.N.J. 1995).

acknowledge the circumscribed purpose of an extradition hearing and the limited ability of a defendant to challenge the evidence presented against him or her in such a proceeding. The following excerpt from a concurring opinion in *Ordinola v. Hackman*, 478 F.3d 588, 608-609 (4th Cir. 2007), is instructive:

> The extradition hearing, of course, "'is not . . . in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him.'" *LoDuca* [*v. United States*, 93 F.3d 1110, 1104 (2d Cir. 1996)] (quoting *Benson v. McMahon*, 127 U.S. 457, 463 (1888)). Stated differently, the hearing is "not designed as a full trial" but as a means of "inquir[ing] into the presence of probable cause to believe that there has been a violation of one or more of the criminal laws of the extraditing country." *Peroff v. Hylton*, 542 F.2d 1247, 1249 (4th Cir.1976); see *Eain* [*v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981)] ("It is fundamental that the person whose extradition is sought is not entitled to a full trial at the magistrate's probable cause hearing . . . . That is the task of the . . . courts of the other country.").

> Although the extradition statute does not mention "probable cause" and instead directs the extradition court to determine whether there is "evidence sufficient to sustain the charge under the provisions of the proper treaty or convention," 18 U.S.C.A. § 3184, courts have uniformly interpreted the statutory language to require a finding of "probable cause." *See Vo* [*v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006)]; *Sidali* [*v. INS*, 107 F.3d 191, 195 (3d Cir. 1997)]. Thus, "[t]he probable cause standard applicable to an extradition hearing is the same as the standard used in federal preliminary hearings," meaning that *the magistrate judge's role is merely "to determine whether there is competent evidence to*

*justify holding the accused to await trial*." *Hoxha* [*v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006)] (internal quotation marks omitted). In that vein, the evidence considered by the magistrate as part of an extradition hearing "need not meet the standards for admissibility at trial" and "may be based upon hearsay in whole or in part." [*United States v.*] *Kin-Hong*, 110 F.3d [103,] 120 [(1st Cir. 1997)] (internal quotation marks omitted).

Not only are the admissibility standards relaxed, but the alleged fugitive's ability to challenge the government's evidence or to submit evidence of his own at the extradition hearing is also significantly limited. For example, the fugitive has no right to cross-examine witnesses, *see Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406-07 (9th Cir. 1988), or to introduce "contradictory evidence" that conflicts with the government's probable cause evidence, *see Hoxha*, 465 F.3d at 561. By contrast, "explanatory evidence" relating to the underlying charges is admissible. *See Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991).

If the extradition judge concludes that there is, in fact, probable cause, he "is required to certify the individual as extraditable to the Secretary of State." *Vo*, 447 F.3d at 1237 (internal quotation marks omitted).

*Ordinola v. Hackman*, 478 F.3d 588, 608-609 (4th Cir. 2007) (Traxler, J., concurring) (emphasis added; footnote omitted). As the concurring opinion in *Ordinola* observes, the purpose of an extradition hearing is merely to make a probable cause determination, not to conduct a trial on the merits of the criminal charges. Accordingly, the procedural safeguards attending a criminal trial are absent from an extradition hearing. Consequently, evidence which might be excluded at trial,

including hearsay evidence, is admissible at the extradition hearing; the accused is prohibited from challenging the government's evidence and from submitting evidence on his or her own behalf; and the accused has no right to cross-examine witnesses. These conditions set a high bar for obtaining a favorable termination at the extradition stage of proceedings. In a case such as this one, where the evidence supporting probable cause was obtained in the United States by United States federal officials, it seems unreasonable to limit the favorable termination element of a malicious prosecution claim to a favorable result in the extradition hearing, particularly in light of the narrow purpose of such a hearing and the limited ability of the accused to challenge the evidence presented against him or her at that proceeding.

I would also note that, for purposes of a malicious prosecution claim, the prosecution was arguably initiated in the United States.[3] Although formal charges were brought in Korea, the interrogation yielding the allegedly false confession to establish probable cause may properly be considered to have initiated prosecution because it resulted in the issuance of an arrest warrant and, consequently, Snider's arrest in this country. *See Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996) (finding that a wrongful arrest could conceivably constitute the first step towards a malicious prosecution claim). Because the criminal proceedings could be deemed to have been initiated in the United States, I believe that it should be recognized that Snider's acquittal was a favorable termination of the criminal proceedings against her, even though the termination occurred in Korea.

Finally, the majority opinion contends that the protections afforded to criminal defendants by the United States Constitu-

---

[3]As noted above, one of the elements of a Fourth Amendment "malicious prosecution" claim is the initiation or maintenance of a criminal proceeding by the defendant in the malicious prosecution action. *See Lambert v. Williams*, 223 F.3d 257, 260-262 (4th Cir. 2000).

tion do not apply to prosecutions in foreign jurisdictions. As support, the majority opinion cites *United States v. Balsys*, 524 U.S. 666, 672-74 (1998). There, Aloyzas Balsys ("Balsys"), a resident alien in deportation proceedings, refused to answer questions about his activities in certain foreign countries during World War II because his answers could potentially subject him to criminal prosecutions by those foreign governments. As grounds for his refusal to answer, Balsys invoked the Fifth Amendment privilege against self-incrimination. On appeal, the United States Supreme Court framed the issue as "whether a criminal prosecution by a foreign government not subject to our constitutional guarantees presents a 'criminal case' *for purposes of the privilege against self-incrimination*." *Id.* at 672 (emphasis added). The answer, in short, was that it did not. The Court held that a person who fears criminal prosecution only by a foreign government may not invoke the Fifth Amendment privilege against self-incrimination because the sovereign seeking to compel the self-incriminating statements is not the same sovereign that may use the self-incriminating statements in a subsequent criminal prosecution. *Id.* at 673-74.

The circumstances in *Balsys*, I believe, are inapposite to Snider's case, but the majority's statement of the proposition of law for which *Balsys* stands also extends more broadly than that case holds. First, the constitutional privilege that Balsys sought to invoke—the Fifth Amendment right against self-incrimination—was not designed to provide protection in the civil proceedings in which Balsys was then involved, but rather as protection in a possible subsequent criminal action. Here, the constitutional guarantee at issue—the Fourth Amendment right to be free from unreasonable seizure—was designed to provide protection in the very proceedings in which that right was allegedly violated. Moreover, although the Korean government is the sovereign that brought the criminal charges against Snider, it is a United States federal agent who initiated the prosecution in the United States by obtaining the allegedly coerced confession which served as the basis

of probable cause for the Korean government's criminal action against Snider to proceed. It is difficult for me to conclude that *Balsys* means that the Fourth Amendment protection to be free from unreasonable seizure without probable cause does not extend to a United States citizen whose seizure resulted from a coerced confession obtained by a United States federal agent on United States soil merely because a foreign sovereign, not the United States, pursued the criminal action.

Although the analysis and rationale set forth in the majority opinion differ from mine, I firmly believe that the majority reaches the correct result. A law enforcement officer who presents all relevant probable cause evidence to a prosecutor, a magistrate, or other intermediary is insulated from a malicious prosecution claim where such intermediary makes an independent decision to pursue prosecution or issue a warrant, thereby breaking the causal chain between the officer's conduct and the prosecution unless the officer concealed or misrepresented facts or brought such undue pressure to bear on the intermediary that the intermediary's independent judgment was overborne. *See Rhodes v. Smithers*, 939 F. Supp. 1256, 1274 (S.D. W. Va. 1995) (collecting cases), *aff'd*, 91 F.3d 132 (4th Cir. 1996); *see also Taylor v. Meacham*, 82 F.3d 1556, 1564 (10th Cir. 1996); *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996). Here, the Assistant United States Attorney pursued prosecution on behalf of the Korean Government by seeking a provisional arrest warrant and subsequent extradition. An arrest warrant was issued and a detention hearing was held. The magistrate judge ordered Snider detained pending her extradition hearing. Moreover, an extensive extradition hearing was held. After that hearing and in consideration of the evidence presented, the magistrate judge found that the evidence established probable cause to extradite Snider. Nothing on the record suggests that Snider alleges that Agent Lee made false or misleading statements to the prosecutors or the magistrate judge or that Agent Lee otherwise brought undue influence to bear on their independent

judgment. Under these circumstances, even if Agent Lee coerced Snider into falsely confessing, the causal chain was broken, and, accordingly, there was no constitutionally infirm seizure. Therefore, Snider's malicious prosecution claim should not have been permitted to go forward, since Agent Lee is entitled to qualified immunity.